No. 124,378

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

LEAGUE OF WOMEN VOTERS OF KANSAS, LOUD LIGHT, KANSAS APPLESEED CENTER FOR
LAW AND JUSTICE, INC., and TOPEKA INDEPENDENT LIVING RESOURCE CENTER,
*Appellants*,

v.

SCOTT SCHWAB, in His Official Capacity as Kansas Secretary of State,
and DEREK SCHMIDT, in His Official Capacity as Kansas Attorney General,
*Appellees*.

SYLLABUS BY THE COURT

1.

An association has standing to sue on behalf of its members when: (1) the members have standing to sue individually; (2) the interests the association seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires participation of individual members.

2.

To demonstrate standing in Kansas, the traditional test is twofold: a person must demonstrate that he or she suffered a cognizable injury, also known as an injury in fact, and that there is a causal connection between the injury and the challenged conduct.

3.

The injury in fact requirement is not satisfied where the complained of injury is merely conjectural.

**4.**

A plaintiff is not required to expose himself or herself to liability before bringing suit to challenge the constitutionality of a law threatened to be enforced, but the requirement of standing still must be satisfied for a justiciable controversy to exist.

**5.**

In pre-enforcement questions the injury in fact component of the standing inquiry is satisfied when a party establishes an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and the party faces a credible, substantial threat of prosecution under the challenged provision.

**6.**

The perceived threat of prosecution must be one that is objectively reasonable. A subjective fear is not sufficient to satisfy the third prong of the pre-enforcement inquiry.

**7.**

Voter outreach, education, and registration efforts receive protection under the First Amendment.

**8.**

In adopting K.S.A. 2021 Supp. 25-2438, the Legislature sought to subject only those individuals to prosecution who "knowingly" engaged in the conduct prohibited by the provision.

**9.**

Self-censorship in response to a law's passage may satisfy the concrete injury in fact element required to establish standing when (1) there is evidence that, in the past, the individual engaged in the type of conduct that is affected by the challenged government action; (2) affidavits or testimony are available that evidence a present desire, though no

2

specific plans, to engage in such conduct; and (3) the individual can articulate a plausible claim that they presently have no intention to engage in such conduct because of a credible threat that to do so would subject them to adverse consequences.

10.

If a person does not have standing to challenge an action or request a particular type of relief, then a justiciable controversy does not exist and the case must be dismissed.

11.

Kansas courts lack the constitutional authority to issue advisory opinions.

Appeal from Shawnee District Court; TERESA WATSON, judge. Opinion filed June 17, 2022. Appeal dismissed.

*Henry J. Brewster*, *Elisabeth C. Frost*, *Tyler L. Bishop*, and *Spencer M. McCandless*, pro hac vice, of Elias Law Group LLP, of Washington, D.C., *Pedro Irigonegaray*, *Nicole Revenaugh*, *Jason Zavadil*, and *J. Bo Turney*, of Irigonegaray, Turney, & Revenaugh LLP, of Topeka, and *David Anstaett*, pro hac vice, of Perkins Cole LLP, of Madison, Wisconsin, for appellants.

*Bradley J. Schlozman* and *Scott R. Schillings*, of Hinkle Law Firm LLC, of Wichita, and *Brant M. Laue*, solicitor general, and *Derek Schmidt*, attorney general, for appellees.

Before GARDNER, P.J., HILL and ISHERWOOD, JJ.

ISHERWOOD, J.:  The League of Women Voters of Kansas (the "League"), Loud Light, Kansas Appleseed Center for Law and Justice, Inc. ("Kansas Appleseed"), and Topeka Independent Living Resource Center (the "Center") (collectively the "appellants") challenge two sections of a relatively new Kansas crime, K.S.A. 2021 Supp. 25-2438, which makes it a severity level 7, nonperson felony to knowingly misrepresent

3

oneself as an election official. Appellants contend the broad language of the statute results in the criminalization of their voter education, engagement, and registration activities. As support for their contention, they assert that occasionally during past voter-assistance activities, an observer believed they were election officials despite clearly identifying themselves as volunteers with their respective organizations. The appellees disagree and contend the appellants' concern is unfounded because the statute demands that the misrepresentation at issue be the product of knowing conduct before an individual is subject to prosecution. Following a conscientious and exacting review of the issues presented, in conjunction with the evidence and arguments offered in support thereof, we find that the appellants failed to satisfy their burden to demonstrate an actual injury in fact as required to have standing to litigate their claims. In the absence of standing there is no justiciable controversy. Accordingly, the appellants' case must be dismissed.

FACTUAL AND PROCEDURAL BACKGROUND

The League, Loud Light, Kansas Appleseed, and the Center are non-partisan, non-profit organizations that perform voter outreach, education, and registration in an effort to encourage greater civic engagement. During the 2020 election cycle, the League registered over 2,000 Kansas voters. In that same time period, Loud Light produced a widely shared educational video about Kansas' advance voting process, used its social media platforms to combat misinformation about the process, and contacted voters whose ballots were challenged by county election officers but whom the county was unable to reach. It also played an integral role in registering over 9,000 voters during that cycle. The mission of Kansas Appleseed is to educate and engage voters in traditionally underrepresented populations in Southwest and Southeast Kansas. The Center works closely with disabled Kansans and strives to increase voter registration and participation among that population to ensure they are equipped to make their voices heard through the voting process.

4

Although consistently, and without reservation, the appellants make their respective affiliations known when conducting activities in the community, on occasion an attendee at their events has mistaken one of their volunteers for a county election official. When such incidents occur, the volunteers quickly clarify which organization they represent and that they are not election officials.

During the 2021 Kansas legislative session, the Legislature passed Senate Substitute for House Bill 2183, which contained various new laws bearing on election matters. Governor Kelly concluded such laws were not warranted and vetoed the bill. The Kansas Legislature overrode the veto, however, and the law went into effect on July 1, 2021. L. 2021, ch. 96, § 3.

In relevant part, the bill made it a severity level 7, nonperson felony to falsely represent oneself as an election official. False representation of an election official is knowingly (when one is not an election official):

> "(1) Representing oneself as an election official;
> "(2) engaging in conduct that gives the appearance of being an election official;
or
> "(3) engaging in conduct that would cause another person to believe a person engaging in such conduct is an election official." K.S.A. 2021 Supp. 25-2438.

In the wake of the law's passage, the appellants cancelled or curtailed various scheduled events. They feared that if their volunteers continued to engage in their respective organization's standard activities it would subject them to prosecution under the new statute.

In June 2021, the appellants moved for a temporary injunction on the grounds that K.S.A. 2021 Supp. 25-2438(a)(2) and (a)(3) violated their rights under section 11 of the Kansas Constitution Bill of Rights. The appellees responded, in part, that the appellants

lacked standing to advance their challenge because they failed to identify any statements made or efforts undertaken that demonstrated individuals who engaged in the type of voter outreach programs conducted by the appellants ran afoul of the provision.

The appellees explained that the impetus for the law was an incident that occurred during the previous election cycle. Specifically, the distribution of letters that purported to be from an official agency and contained confusing or inaccurate information pertaining to critical electoral matters, as well as multiple advance ballot applications, and directions to what appeared to be legitimate websites where voters could complete information to receive advance ballots. The appellees asserted that only those individuals who knowingly engage in activities designed to give the false appearance they are election officials, or would cause a person to so believe, were at risk of prosecution under the statute. Thus, according to the appellees, the statute did not prohibit the appellants from engaging in their typical voter registration and advocacy efforts.

On July 27, 2021, the Douglas County District Attorney publicly announced she would not prosecute cases under the new law. In her opinion, the law was too vague, overbroad, and criminalized essential efforts to engage Kansans in the democratic process.

The Kansas Attorney General issued a statement in response to assure Kansans that violators of the law would still be prosecuted:

> "'Thousands of Kansans will go to the polls tomorrow in the municipal primary elections. Citizens throughout our state deserve assurance that state election-integrity laws will be enforced and election crimes, like all other crimes, will be prosecuted when warranted by the evidence. On July 27, the Douglas County District Attorney announced that office will not prosecute certain categories of election crimes, but state law also authorizes prosecution by the attorney general. The law of the State of Kansas is in effect statewide, including in Douglas County, so any law enforcement agencies that obtain evidence of

6

election crimes may present the results of an investigation to our office for review, and we will make a prosecution decision based on the facts and law applicable to any individual case.'"

The district court conducted a hearing on the appellants' motion. Following a review of the parties' extensive filings, evidentiary affidavits, and oral arguments, it declined to order an injunction. The court bypassed the standing question and concluded that the relief requested could not be granted because the appellants failed to demonstrate a substantial likelihood of eventually prevailing on the merits of their claim.

The appellants now bring the matter before us to resolve.

ANALYSIS

Laws that demand transparency in the identities of those voices disseminating voting and election information carry the potential to impose impermissible burdens on the exercise of free speech under the First Amendment. The appellants consist of four separate groups that actively promote civic engagement by conducting various voter outreach and education events throughout the State—League of Women Voters, Kansas Appleseed, Loud Light, and the Center. Operating under the belief the aforementioned impermissible burdens were realized here with the Kansas Legislature's passage of K.S.A. 2021 Supp. 25-2438, which prohibits the false representation of oneself as an election official, the appellants unsuccessfully moved the district court to temporarily enjoin enforcement of the second and third subsections of that provision.

A three-prong test must be satisfied for an association to sue on behalf of its members:  (1) the members must have standing to sue individually; (2) the interests the association seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires participation of individual members. *Sierra Club v. Moser*, 298 Kan. 22, 33, 310 P.3d 360 (2013) (quoting *NEA-Coffeyville v.*

7

*U.S.D. No. 445*, 268 Kan. 384, Syl. ¶ 2, 996 P.2d 821 [2000]). With the exception of standing, as will be fleshed out in the forthcoming analysis, we have no qualms with the organizations advancing this challenge on behalf of their members.

Our first obligation is to determine whether we have jurisdiction over this matter. The starting point for that inquiry is Article 3, § 1 of the Kansas Constitution which grants the "judicial power'" of the State to the courts. Judicial power is characterized as the authority to hear, consider, and determine controversies between litigants. *Baker v. Hayden*, 313 Kan. 667, 672, 490 P.3d 1164 (2021). Because Article 3 does not specifically include any "case" or "controversy" language, that requirement emanates from the separation of powers doctrine embodied in the Kansas constitutional framework. See *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 896, 179 P.3d 366 (2008). That doctrine recognizes that of the three departments or branches of government, "[g]enerally speaking, the legislative power is the power to make, amend, or repeal laws; the executive power is the power to enforce the laws, and the judicial power is the power to interpret and apply the laws *in actual controversies*." (Emphasis added.) *Van Sickle v. Shanahan*, 212 Kan. 426, 440, 511 P.2d 223 (1973). While Kansas, not federal, law determines the existence of a case or controversy, i.e., justiciability, "this court is not prohibited from considering federal law when analyzing justiciability." *Gannon v. State*, 298 Kan. 1107, 1119, 319 P.3d 1196 (2014). The presence of concrete adverseness is critical. An abstract controversy is not sufficient to satisfy the constitutional standard because courts do not give advisory opinions. See *Sebelius*, 285 Kan. at 896-98. Thus, the district court's jurisdiction to impose appellants' requested injunction depended upon the existence of a true controversy between the parties. *Shipe v. Public Wholesale Water Supply Dist. No. 25*, 289 Kan. 160, 165, 210 P.3d 105 (2009). To warrant injunctive relief it must clearly appear that some act has been done or is threatened. *Unified School District No. 503 v. McKinney*, 236 Kan. 224, 227, 689 P.2d 860 (1984).

We analyze four factors to assess whether an actual controversy exists. First, the complaining party must have standing. Standing is also a component of subject matter jurisdiction. *Gannon*, 298 Kan. at 1122. It requires the court to decide whether a party has alleged a sufficient personal stake in the outcome of the controversy to invoke jurisdiction and to justify the court exercising its remedial powers on the party's behalf. *Cochran v. Kansas Dept. of Agriculture*, 291 Kan. 898, 903, 249 P.3d 434 (2011). A personal stake exists when the party has a right to make a legal claim or seek judicial enforcement of a duty or right. Second, we must determine whether the issue we are asked to resolve is moot. Third, that issue must be ripe, in that it has taken fixed and final shape rather than remaining nebulous and contingent. Finally, we consider whether a political question is at issue. See *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 324, 255 P.3d 1186 (2011) (discussing and defining standing); *Sebelius*, 285 Kan. at 896 (listing the four requirements).

That first step, standing, like other jurisdictional issues, is a question of law subject to unlimited review. *Sierra Club*, 298 Kan. at 29. The traditional test for standing in Kansas requires a litigant to show that he or she suffered a cognizable injury, also known as an injury in fact, and that there is a causal connection between the injury and the challenged conduct. *Gannon*, 298 Kan. at 1123; *Comprehensive Health of Planned Parenthood v. Kline*, 287 Kan. 372, 406, 197 P.3d 370 (2008). Additionally, our Supreme Court has occasionally cited and applied the federal rule's standing elements that "a party must present an injury that is concrete, particularized, and actual or imminent; the injury must be fairly traceable to the opposing party's challenged action; and the injury must be redressable by a favorable ruling." *Ternes v. Galichia*, 297 Kan. 918, 921, 305 P.3d 617 (2013) (citing *Horne v. Flores*, 557 U.S. 433, 445, 129 S. Ct. 2579, 174 L. Ed. 2d 406 [2009]); see also *Gannon*, 298 Kan. at 1123. We will follow their lead and incorporate those factors into our standing analysis. Finally, injuries that are merely conjectural or hypothetical fall short of the hurdle. *Tandy v. City of Wichita*, 380 F.3d 1277, 1283-84 (10th Cir. 2004); see also *Labette County Medical Center v. Kansas Department of*

9

*Health and Environment*, No. 116,416, 2017 WL 3203383, at *9 (Kan. App. 2017) (unpublished opinion). Each element of the inquiry must be proved just as any other matter and with the degree of evidence required at the successive stages of the litigation. *KNEA v. State*, 305 Kan. 739, 746, 387 P.3d 795 (2017). Even so, the "'[f]irst and foremost'" of standing's three elements is "injury in fact." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016) (quoting *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103, 118 S. Ct. 1003, 140 L. Ed. 2d 210 [1998]).

This case could yield an analysis of the various nuances of K.S.A. 2021 Supp. 25-2438 in order to determine whether it unlawfully constrained appellants' First Amendment rights. But the posture of this appeal forecloses that path. Although the appellees raised the issue of standing before the district court, that court sidestepped the issue and, in so doing, "put the merits cart before the standing horse." *Initiative and Referendum Institute v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006). We decline to commit the same misstep. An appellate court can generally determine the standing issue because it presents a question of law. See *Baker*, 313 Kan. at 673. Keenly aware of what is potentially at stake, we analyze and meticulously filter the appellants' claims through the standing rubric outlined above. *Reynolds v. Sims*, 377 U.S. 533, 562, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964) ("the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be meticulously scrutinized"). We ultimately conclude the appellants lack standing to challenge the statute due to their failure to successfully establish the existence of a cognizable, actual injury.

The dissent intimates that our conclusion here today is the product of a flawed mindset which mandates a plaintiff first be "arrested, charged, tried, convicted, and sentenced to prison before they dare challenge this law." Slip op. at 27 (Hill, J., dissenting). That is neither our interpretation of the law nor our expectation. Rather, we fully recognize that a plaintiff seeking relief is not required to have endured such

10

measures as a prerequisite to challenging the law or have suffered the full harm expected to satisfy their obligation to establish the injury in fact component. Thus, when the government threatens action, we acknowledge the potential for a pre-enforcement challenge. See *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007) ("[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat."); see also *Baker v. City of Overland Park*, No. 101,371, 2009 WL 3083843, at *4 (Kan. App. 2009) (unpublished opinion). The appellants' case falls in this category. In pre-enforcement questions the injury in fact component of the standing inquiry is satisfied when a party establishes "'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 134 S. Ct. 2334, 189 L. Ed. 2d 246 (2014) (quoting *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298, 99 S. Ct. 2301, 60 L. Ed. 2d 895 [1979]). Such allegations of future injury may suffice as an injury in fact if the threatened injury is "'certainly impending'" or there is a substantial risk that the harm will occur. *Sierra Club*, 298 Kan. at 33-34; see also *Clapper v. Amnesty International USA*, 568 U.S. 398, 409, 133 S. Ct. 1138, 185 L. Ed. 2d 264 (2013). The dissent misconstrues our analysis of each of these factors as an inexplicable exercise of interpreting the law to resolve the standing question, so we do not have to interpret the law to resolve the merits of the claim. But standing does not simply manifest with a litigant's self-designation of their claim as a pre-enforcement challenge. Rather, that avenue presents its own series of hurdles that must first be cleared before their burden to establish standing is satisfied.

To begin that analysis, we again recognize that appellants are non-partisan, nonprofit organizations whose primary mission is to encourage eligible Kansans to participate in the democratic process. To accomplish that goal, they perform various voter outreach, education, and registration activities across different regions of the state.

11

According to the appellants, although they do not misrepresent themselves, on occasion a few visitors at their events, "[a]mong the literally thousands of Kansans whom [appellants] regularly interact with," have mistaken them for election officials. They make clear in their brief to us "that—despite their best efforts to communicate that they are *not* elections officials—some people with whom they interact (or who observe their activities) assume they are acting in an official capacity," "even when [appellants] do not intend to cause that error (or even work to guard against it)."

The statute that provides the foundation for their claim is K.S.A. 2021 Supp. 25-2438, a relatively new provision which makes commission of the following act(s) a severity level 7, nonperson felony:

"(a) False representation of an election official is knowingly engaging in any of the following conduct by phone, mail, email, website or other online activity or by any other means of communication while not holding a position as an election official:

(1) Representing oneself as an election official;

(2) engaging in conduct that gives the appearance of being an election official; or

(3) engaging in conduct that would cause another person to believe a person engaging in such conduct is an election official.

"(b) False representation of an election official is a severity level 7, nonperson felony.

"(c) As used in this section, 'election official' means the secretary of state, or any employee thereof, any county election commissioner or county clerk, or any employee thereof, or any other person employed by any county election office."

The appellants contend that they "canceled and curtailed voter engagement and registration activities across the state, *out of fear* that their actions *could be misconstrued*

12

and result in criminal liability" under subsections (a)(2) and (a)(3). (Emphasis added.) We will address each of the three general pre-enforcement questions in turn.

## DO THE APPELLANTS ENGAGE IN A COURSE OF CONDUCT THAT IS AFFECTED WITH A CONSTITUTIONAL INTEREST?

The appellants conduct various events throughout the State which, at their most fundamental level, are simply designed to promote civic engagement. Through educational activities and voter registration drives they seek to impress upon eligible Kansans the importance of active participation in the democratic process. In large measure, the parties do not dispute that the appellants' conduct falls squarely within the ambit of the First Amendment. Their position in this regard aligns with conclusions reached by several federal courts when called on to analyze similar issues. See *League of Women Voters of Florida, Inc. v. Lee*, ___ F. Supp. 3d ___, 2022 WL 969538 (N.D. Fla. 2022); *VoteAmerica v. Schwab*, __ F. Supp. 3d __, 2021 WL 5918918, at *7 (D. Kan. 2021) (public endeavors which assist people with voter registration are intended to convey a message that voting is important and implicate the First Amendment); *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019) (statutes regulating various aspects of voter registration involved direct regulation of communication and were thereby subject to scrutiny under the First Amendment); *League of Women Voters of Florida v. Browning*, 863 F. Supp. 2d 1155, 1158 (N.D. Fla. 2012) ("[E]ncouraging others to register to vote" is "pure speech," and, because that speech is political in nature, it is a "core First Amendment activity."); *Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1217 (D.N.M. 2010) ("The First Amendment protects not only the Plaintiffs' right to engage in incidental speech with prospective voters, but also their right to do so while engaging in the act of registration."). There is no discernible reason to depart from that line of thinking in this case.

13

To some degree, this step of the pre-enforcement standing analysis is intertwined with the final factor, which is whether the appellants face a credible threat of prosecution if they persist in their advocacy efforts. Even so, for purposes of clarity in addressing each point in the inquiry, we will seek to keep each step of the test isolated and distinct.

We begin with a look at the acts captured by the statute. K.S.A. 2021 Supp. 25-2438 makes it unlawful to knowingly engage in conduct which (1) directly communicates that one is an election official, or (2) gives the appearance that one is an election official, or (3) would cause another to believe that one is such an official, knowing the same to not be true. In adopting this provision, the Kansas Legislature sought to combat future permutations of deceptive practices it knew occurred during the most recent election cycle. Specifically, across the country, organizations distributed mailings and ballots made to appear as though the correspondence originated from official state agencies.

"The First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Barr v. American Association of Political Consultants, Inc.*, 591 U.S. __, 140 S. Ct. 2335, 2358, 207 L. Ed. 2d 784 (2020) (Breyer, J., concurring in part and dissenting in part) (quoting *Meyer v. Grant*, 486 U.S. 414, 421, 108 S. Ct. 1886, 100 L. Ed. 2d 425 [1988]). It is our understanding that the appellants' conduct does not involve deceptive practices but is properly characterized as reasonable efforts to foster discourse and facilitate the exchange of ideas.

That is, the appellants classify their outreach activities as simply nonpartisan manifestations of their desire to motivate others to embrace their opportunity to play an active role in building stronger communities. So they are driven solely by their aspiration

14

to encourage more robust and informed civic engagement. Thus, the activities at issue lack the nefarious or deceptive qualities K.S.A. 2021 Supp. 25-2438 is designed to combat, placing the appellants beyond its reach. When there is nothing in the record before us or from the arguments presented which suggests that the appellants intend to, desire to, or anticipate engaging in the type of conduct prohibited by the statute, we must find this factor does not favor the appellants.

DOES THE APPELLANTS' CONDUCT SUBJECT THEM TO A SUBSTANTIAL, CREDIBLE THREAT OF PROSECUTION UNDER K.S.A. 2021 SUPP. 25-2438(a)(2) OR (a)(3)?

The third step of the pre-enforcement standing analysis requires us to assess whether the appellants' advocacy efforts were inhibited by an objectively justified fear of real consequences as evidenced by a credible threat of prosecution or other consequences arising out of enforcement of the statute. *Susan B. Anthony List*, 573 U.S. at 159. "The threat of prosecution is generally credible where a challenged 'provision on its face proscribes' the conduct in which a plaintiff wishes to engage, and the state 'has not disavowed any intention of invoking the . . . provision' against the plaintiff." *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 901 (10th Cir. 2016) (quoting *Babbitt*, 442 U.S. at 302).

Again, the appellants' argument consists of a claim that they "canceled and curtailed voter engagement and registration activities across the state, out of fear that their actions could be misconstrued and result in criminal liability" under subsections (a)(2) and (a)(3). This is, in some measure, where the dissent loses its way. It seeks to provide a foundation for its claim that the required injury in fact exists because "to [the appellants], the threat of prosecution is real." Slip op. at 29 (Hill, J., dissenting). But a plaintiff's subjective and irrational fear of prosecution is not enough to confer standing. See *Laird v. Tatum*, 408 U.S. 1, 13-14, 92 S. Ct. 2318, 33 L. Ed. 2d 154 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific

15

present objective harm or a threat of specific future harm."). Rather, a plaintiff succeeds in establishing injury in fact from the threat of prosecution or enforcement when the threat of enforcement is substantial. See *Susan B. Anthony List*, 573 U.S. at 164; see also *Woodhull Freedom Foundation v. United States*, No. 18-1552 (RJL), 2022 WL 910600, at *4 (D.D.C. 2002) (pre-enforcement standing requires a prospective plaintiff to show that the threat of future enforcement of the statute was substantial). The nature of the threat contemplated by this factor is one that is "'well-founded'" and "not 'imaginary or wholly speculative.'" *Susan B. Anthony List*, 573 U.S. at 160. Put yet another way, the fear of prosecution must be "*objectively reasonable.*" (Emphasis added.) *New Hampshire Right to Life Political Action Committee v. Gardner*, 99 F.3d 8, 14 (1st Cir. 1996); see also *Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*, 51 F. Supp. 2d 107, 111 (D.R.I. 1999). Both the injury based on threat of prosecution and the injury based on self-censorship depend on "the existence of a credible threat that the challenged law will be enforced." *New Hampshire Right to Life Political Action Committee*, 99 F.3d at 14. "[P]ersons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs." *Younger v. Harris*, 401 U.S. 37, 42, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971).

The appellants harbor a fear that if their members continue to engage in their customary activities, with no deviation from the same, an attendee at one of their events may happen to misunderstand that member's role or affiliation and the member will then face felony charges as a result. Importantly, the appellants do not allege that they plan to mislead potential voters about their identities or otherwise misrepresent their affiliation. The appellees argue that based on the lack of such an intention to violate the provision, there is no credible threat the appellants will be in the crosshairs of prosecution. We are inclined to agree with the appellees.

The primary impediment to the appellants' ability to establish a substantial threat of prosecution is found with the mens rea assigned to the offense. Mens rea refers to an

16

actor's moral culpability or "'evil mind.'" *State v. Jorrick*, 269 Kan. 72, 82, 4 P.3d 610 (2000). More specifically, it contemplates criminal intent or the specific mental element contained in the applicable criminal statute. 269 Kan. at 82. In drafting K.S.A. 2021 Supp. 25-2438, the Legislature sought to subject only those individuals to prosecution who "knowingly" engaged in the conduct prohibited by the provision. K.S.A. 2021 Supp. 21-5202 clarifies what it means to act with that particular state of mind:

> "(a) Except as otherwise provided, a culpable mental state is an essential element of every crime defined by this code. A culpable mental state may be established by proof that the conduct of the accused person was committed 'intentionally,' 'knowingly' or 'recklessly.'

> . . . .

> "(i) A person acts 'knowingly,' or 'with knowledge,' with respect to the nature of such person's conduct or to circumstances surrounding such person's conduct when such person is aware of the nature of such person's conduct or that the circumstances exist. A person acts 'knowingly,' or 'with knowledge,' with respect to a result of such person's conduct when such person is aware that such person's conduct is reasonably certain to cause the result. All crimes defined in this code in which the mental culpability requirement is expressed as 'knowingly,' 'known,' or 'with knowledge' are general intent crimes."

> "'[A]s to the results of one's conduct, the [Model Penal] Code provides that . . . . [O]ne acts "knowingly" if "he is aware that it is practically certain that his conduct will cause such a result." . . . One is said . . . to act "knowingly" as to the nature of his conduct if "he is aware that his conduct is of that nature." As to the attendant circumstances . . . . one acts "knowingly" when "he is aware . . . that such circumstances exist."'" *State v. Murrin*, 309 Kan. 385, 394, 435 P.3d 1126 (2019) (quoting *1 LaFave*, Substantive Criminal Law § 5.2[b] [3d ed. 2018]).

Black's Law Dictionary defines knowingly as

17

"In such a manner that the actor engaged in prohibited conduct with the knowledge that the social harm that the law was designed to prevent was practically certain to result; deliberately. . . . Under the Model Penal Code . . . . a person who acts *knowingl*y understands that the social harm will almost certainly be a consequence of the action . . . ." Black's Law Dictionary 1042 (11th ed. 2019).

Webster's New World College Dictionary defines knowing as "1. having knowledge or information 2. shrewd; clever 3. implying shrewd understanding or possession of a secret or inside information [a knowing look] 4. deliberate; intentional." Webster's New World College Dictionary 806 (5th ed. 2014).

We will review the appellants' actions against the backdrop of the above definitions to clarify where their quest to establish an injury in fact fell short. The conduct engaged in by the League of Women Voters includes "community activities [through which] the League engages in conversations with voters and potential voters to convey its message about the importance of voting and political participation," and "in many Counties, the League's work constitutes the bulk of the voter registration and education activities . . . ." There is no appreciable difference in the endeavors undertaken by Loud Light, Kansas Appleseed, and the Center.

The definitions of knowingly mean that a prosecuting attorney conducting a charging assessment, or a jury weighing evidence adduced at trial, would need to find that the appellants were aware of the nature of the conduct of which the State complains. In other words, the appellants had to undertake their civic engagement activities knowing that they were reasonably certain to give the impression to event attendees, or "*would*," *not* could, cause an event attendee to believe the appellants were election officials. (Emphasis added.) See K.S.A. 2021 Supp. 25-2438.

The record before us lacks any evidence of such "knowledge" but teems with evidence to the contrary. In truth what it reveals is that the appellants collectively labor

18

under a misconception that the language of the provision does not demand any deliberate conduct by their members before they can be at risk of prosecution. Rather, they believe an innocent advocate will be subject to criminal repercussions if, through no fault of their own, a single outreach participant or event attendee merely walks away from an encounter with the mistaken belief that the voice they heard was that of a county election official. From the appellants' arguments before the district court and the corresponding evidence they submitted in support of their position, through the briefs to our court, and the points highlighted during oral argument, they have consistently and erroneously viewed the provision through the wrong lens. That is, they focus solely on the listener, and turn a blind eye to the requirement for and analysis of the conduct of the actor that was the calculated impetus for the misidentification. For example, the Director of the Center submitted an affidavit during the district court proceedings, which is now part of the record before us, attesting to the perceived ties binding the hands of the organization as a result of the statute's passage. She stated therein that "a simple misconception by someone other than our advocates is *all* the statute requires to be liable for serious prison time and crippling fines." (Emphasis added.) Loud Light similarly contends that its "staff, volunteers, and fellows, *through no fault of their own*, will be subject to criminal penalties" if they continue to engage in activities in furtherance of the organization's mission. (Emphasis added.)

These interpretations are fundamentally flawed and run contrary to the plain language of the statute, which strictly prohibits *knowing conduct* on the part of the speaker, which results in the misrepresentation of their identity. It is that culpable behavior the provision was implemented to combat. Despite the appellants' assertions to the contrary, mere confusion on the part of a listener, standing alone, is not enough to subject one of their advocates to prosecution, a prison sentence, and a substantial fine under the statute. The misidentification must be preceded by an act or acts undertaken by the advocate with an eye toward the manifestation of that specific result.

19

The evidence we reviewed reflects that, without exception, the appellants unequivocally deny any mea culpa in this matter. They are a coalition of like-minded individuals motivated by a singular cause—fairness and equity in the democratic process. Because of their advocacy efforts, thousands of Kansans who may otherwise be at risk of experiencing a sense of disenfranchisement based on their gender, race, disability, age, socioeconomic status, or level of education have been invited into the civic engagement discussion.

The appellants embrace their respective callings and proudly display their affiliations while working in the community. In one instance, the Wichita Metro Chapter of the Kansas League of Women Voters drove caravans of decorated vehicles through parts of the community known for its low voter turnout, waving banners promoting the website for the United States League of Women Voters alongside their voter registration messages. On another occasion, the Kansas League hosted a large booth at the Kansas State Fair staffed by multiple volunteers. While educating and registering potential voters, the group also shared the story of the League and the development of its Kansas Chapter. Finally in another example, when Loud Light undertook an effort to assist voters whose ballots were flagged for deficiencies, their volunteers placed direct calls to those voters and "always identified [themselves] as affiliated with Loud Light."

These organizations are extraordinarily proud of the work they do in our communities. Thus, the statement the Director of the Center made in her affidavit, "To be clear, nobody—not myself, nor anyone else I'm aware of—wants to be mistaken for an election official . . . ." is truly reflective of the appellants' collective mindset. The League takes steps "[a]t each in-person and virtual event [t]o always represent themselves" as members of the organization. Kansas Appleseed adheres to the same principle and "always correctly identify [themselves] as affiliated with Kansas Appleseed, and not any governmental office or body." In those isolated instances when misidentification occurred the appellants did not hesitate to promptly set the record straight.

20

The appellants have every right to feel a sense of pride. Voter outreach and education are crucial parts of our democracy. Every eligible Kansan should be afforded the opportunity to embrace the privilege of casting a vote to ensure their voices are heard. It is that display of pride that places the appellants beyond the statute's reach and insulates them from prosecution. Notably, because of the appellants' standard practice in clearly identifying their respective affiliations, of the "tens of thousands of Kansans" with whom they interacted in 2020 alone, only "some" inadvertently mistook volunteers for election officials. And again, when those mistakes occurred, the listener was quickly corrected. We are not so deeply entrenched in our position that we are blind to the fact such misperceptions happen on occasion. The reality that must be acknowledged, however, is that the record reflects such incidents are anomalous, rather than frequent, occurrences. The dissent's assertion that misidentifications "happen often" lacks a factual foundation. Slip op. at 31 (Hill, J., dissenting).

In attempting to convince us their fear is substantiated, the appellants highlight a public exchange between a district attorney and the Kansas Attorney General. Shortly after the provision's passage the district attorney at issue publicly announced her dissatisfaction with the statute and vowed not to prosecute anyone under it. The Attorney General responded that Kansas law grants his office concurrent jurisdiction to prosecute election crimes and those crimes "like all other crimes, will be prosecuted when warranted by the evidence." Thus, "any law enforcement agencies that obtain evidence of election crimes may present the results of an investigation to our office for review, and we will make a prosecution decision based on the facts and law applicable to any individual case." The appellants contend the statement from the Attorney General is a shot across the bow intended to put them on notice that if they persist in their activities, prosecution is likely to result. We are not persuaded that the statement carried the menacing undercurrent the appellants attempt to assign it. Rather, we view the utterance as a mere truism. Under K.S.A. 75-702, "The attorney general shall appear for the state,

21

and prosecute and defend any and all actions and proceedings, [and] control the state's prosecution or defense." See *Butler v. Shawnee Mission School District Board of Education*, 314 Kan. 553, 567, 502 P.3d 89 (2022); *Breedlove v. State*, 310 Kan. 56, 72, 445 P.3d 1101 (2019) (Stegall, J., concurring) (explaining that giving prosecutors "'the authority to decide what the law is . . . gives rise to doubts about whether such laws violate the doctrine of separation of powers'" and "'invite[s] arbitrary power'" into the criminal justice system); see also *Sessions v. Dimaya*, 584 U.S. ___, 138 S. Ct. 1204, 1228, 200 L. Ed. 2d 549 (2018) (Gorsuch, J., concurring) (overlooking the separation of powers between branches leaves "prosecutors free to 'condem[n] all that [they] personally disapprove and for no better reason than [they] disapprove it'").

The requirement for a cognizable or actual injury is not satisfied where there is no evidence that a credible, substantial threat of future prosecution exists. To be subject to prosecution, one must engage in the prohibited conduct. See *McCormick v. Board of County Commissioners of Shawnee County*, 272 Kan. 627, Syl. ¶ 10, 35 P.3d 815 (2001). Again, perhaps the affidavit from the Director of the Center sums it up best, wherein she stated: "To be clear, nobody—not myself, nor anyone else I'm aware of—*wants* to be mistaken for an election official . . . ." (Emphasis added.)

As reflected by the analysis above the appellants do not, nor have they ever, engaged in the conduct prohibited by K.S.A. 2021 Supp. 25-2438. Thus, their concern fails to rise above a mere subjective fear, and such is not sufficient to carry their burden. Again, those whose fears of prosecution are merely imaginary or speculative "are not to be accepted as appropriate plaintiffs." *Babbit*, 442 U.S. at 298; see also *Johnson v. Dist. of Columbia*, 71 F. Supp. 3d 155, 162 (D.D.C. 2014) (Johnson's fear stems from speculation and such hypothetical fears cannot support standing under Article III); *Baker v. City of Overland Park*, No. 101,371, 2009 WL 3083843, at *5 (Kan. App. 2009) (unpublished opinion).

The appellants also argue that the substantial harm required to establish standing is evidenced by the fact that in response to the law's passage, they chose to self-censor and hold their activities in abeyance for fear they would otherwise be exposed to criminal liability. The dissent echoes their argument. *Virginia v. American Booksellers Association Inc.*, 484 U.S. 383, 108 S. Ct. 636, 98 L. Ed. 2d 782 (1988), offers a sound analysis of a self-censorship matter, and the appellants' case is not on par with that example. At issue in that case was a statutory amendment which made it unlawful for any person "to knowingly display for commercial purposes in a manner whereby juveniles may examine and peruse" certain visual or written sexual or sadomasochistic material that is harmful to juveniles. 484 U.S. at 386. The Plaintiffs, consisting of several booksellers' organizations and two general purpose bookstores, filed suit claiming the amendment was facially violative of the First Amendment because of the significant and unnecessary burden it imposed on the expressive rights of adults and because of the economically devastating and extremely restrictive measures it demanded booksellers to adopt in order to be in compliance. 484 U.S. at 388.

The United States District Court for the Eastern District of Virginia held a preliminary injunction hearing more reminiscent of a trial on the merits. That is, the court accepted several exhibits and received testimony from several witnesses on the Plaintiffs' behalf regarding how their businesses would be impacted by the statute and what measures must be adopted or implemented to avoid prosecution. In granting the Plaintiffs' motion for injunctive relief the court found the amendment placed "significant burdens" on the First Amendment rights of adults. 484 U.S. at 391. In support of its conclusion, it noted the provision affected much of the booksellers' inventory and the alternatives required of the sellers to achieve compliance were significantly burdensome. 484 U.S. at 391.

By contrast, the appellants here have done nothing more than merely allege a "subjective 'chill'" which is woefully inadequate to establish an injury under this mode of

analysis. *Laird*, 408 U.S. at 13-14. If the only measure required to conjure the jurisdiction of the courts was a bare assertion that, as a result of government action, one merely felt discouraged from speaking, there would be little left of the standing threshold in First Amendment cases. See *Initiative and Referendum Institute*, 450 F.3d at 1089. The Tenth Circuit formulated a test in an effort to establish parameters when self-censorship is alleged, and prospective relief is sought:

> "[P]laintiffs in a suit for prospective relief based on a 'chilling effect' on speech can satisfy the requirement that their claim of injury be 'concrete and particularized' by (1) evidence that in the past they have engaged in the type of speech affected by the challenged government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so because of a credible threat that [adverse consequences] will be enforced." 450 F.3d at 1090.

Filtering the appellants' case through those factors reveals it falls well shy of the mark. As evidenced by the immediately preceding analysis, the appellants, by their own admissions, have not in the past, nor do they intend in the future, to identify themselves as anyone other than advocates for their respective organizations. Additionally, as we concluded above, the appellants failed to sustain their burden to demonstrate their actions subject them to a credible threat of prosecution. Thus, they likewise cannot show that the injury in fact component of the standing analysis is satisfied by their perceived need for self-censorship.

Given the nature of the appellants' claims, the dissent posits that the better analytical tool was that which was articulated by this court in *City of Wichita v. Trotter*, 60 Kan. App. 2d 339, Syl. ¶ 6, 494 P.3d 178 (2021), *rev. granted* 315 Kan. __ (February 25, 2022):

"'To have standing to challenge a law as being so overbroad as to infringe upon rights protected by the First Amendment to the United States Constitution, a party need not establish that he or she was personally injured by the disputed law because the mere existence of the disputed law may cause persons not before the court to refrain from conduct protected by the First Amendment.'" Slip op. at 34 (Hill, J., dissenting).

The elements of that test place the burden upon the plaintiff to prove that (1) the protected activity is a significant part of the law's target, and (2) there exists no satisfactory method of severing the law's constitutional from its unconstitutional applications. 60 Kan. App. 2d 339, Syl. ¶ 6. Thus, even if this test applied, which it does not, the appellants' advancement would be stymied by the same barrier. As meticulously illustrated above, their outreach and advocacy efforts simply do not fall within the type of conduct the statute is designed to combat.

We have been asked to decide an important question concerning the freedom of speech. But before we do so it is incumbent upon us to determine whether an actual controversy exists, and standing is a critical component in that equation. Following a scrupulous analysis, we are unable to conclude that the appellants satisfied their burden to establish the mandated controversy is present. As we stated at the outset of our opinion, the controversy requirement stems from the separation of powers doctrine. When the layers of the appellants' claim are peeled away, what remains is a plea for us to enjoin members of the executive branch of government from executing an act of the legislative branch that the appellants assert is unconstitutional. It is not our desire to fortify the courthouse doors against legitimate controversies, nor can we abandon binding restrictions purely because our intellectual urges tempt us to do so. There is simply no justification for such special solicitude here. "Pleadings must be something more than an ingenious academic exercise in the conceivable." *United States v. SCRAP*, 412 U.S. 669, 688, 93 S. Ct. 2405, 37 L. Ed. 2d 254 (1973). We firmly believe that to delve into the merits of the appellants' statutory challenge when the necessary requirements have not

25

been met blurs the lines of the separation of powers and risks flirting dangerously close to judicial activism. We cannot abide such a transcension of our permissible boundaries.

Our Supreme Court has explained that if a person does not have standing to challenge an action or to request a particular type of relief, then "there is no justiciable case or controversy" and the suit must be dismissed. *Kansas Bar Ass'n v. Judges of the Third Judicial Dist.*, 270 Kan. 489, 490, 14 P.3d 1154 (2000). "When a person who does not have standing to file suit nevertheless asks for relief, it is tantamount to a request for an advisory opinion. Advisory opinions are an executive, not a judicial, power." *Board of Sumner County Comm'rs v. Bremby*, 286 Kan. 745, 750, 189 P.3d 494 (2008) (citing *Sebelius*, 285 Kan. at 885). To render a decision analyzing the nuances of the issues raised in the appellants' case would force us to issue an impermissible advisory opinion. Accordingly, this appeal is dismissed.

Appeal dismissed.

* * *

HILL, J., dissenting: We are asked to review a district court's ruling that a recently enacted election law did not violate the Kansas Constitution. Rather than grapple with the merits of the serious issues of statutory and constitutional interpretation raised in this appeal, my colleagues have chosen to sweep the matter off our bench by holding that the appellants lack standing to sue.

I offer my dissent.

By dismissing this case upon the grounds of standing, the practical effect of the majority's ruling is to tell these four groups—the appellants in this appeal—that one

26

member from each group will have to be arrested, charged, tried, convicted, and sentenced to prison before they dare challenge this law.

Using phrases such as "subjective and irrational fear," "subjective chill," and "merely allege a subjective chill," the majority holds that there is no proof that the appellants have been harmed by this law. Slip op. at 15, 23. I must disagree.

The majority's conclusion is clear and chilling:  "We ultimately conclude the appellants lack standing to challenge the statute due to their failure to successfully establish the existence of a cognizable, actual injury." Slip op. at 10. In other words, you four groups have not yet been injured, so you cannot sue.

Such a holding is not how our freedom of speech should be protected by our Kansas Constitution. With such a ruling as this, there will be no pre-enforcement challenges to Kansas laws under the Kansas Constitution. My friends are erecting unnecessary obstacles that prohibit fair and reasonable legal actions seeking to protect Kansas constitutional liberties. After reading the majority opinion, I cannot say when it would ever permit a pre-enforcement action to test the constitutionality of a new law.

We are the first appellate court to examine this new law. This lawsuit is a pre-enforcement action challenging this new felony. No person or group is prosecuted here. We know of no actual prosecution in Kansas for this crime, nor does this record disclose any such case. In this case, only a petition, a motion for a partial temporary injunction, and a motion to dismiss have been filed. This means that there is no factual history for us to rely on in making our decision. There are a handful of affidavits offered by the parties but there has been no testimony, no witnesses examined or cross-examined, and no factual record to rely on. Our plow breaks new ground.

27

This is a Kansas case. The appellants are Kansas citizens seeking to restrain Kansas officials from enforcing a Kansas law because, in their view that law, on its face, violates the Kansas Constitution. Our guidance should mainly be from the Kansas Supreme Court as the final arbiter of the Kansas Constitution. Binding precedent is found only in that court's rulings.

Both parties and the majority have cited many federal cases in support of their positions. Many deal with the First Amendment to the United States Constitution. None of those cases offer binding precedent on Kansas constitutional questions. If we find such authority persuasive, we should do so explicitly, giving our reasons why we are so persuaded. I note that the majority fails to explain why we should bring in federal standing requirements as found in federal court into this proceeding. They should do so—after all, the two systems are different in this regard.

This difference begins with the test for standing. Kansas courts use a two-part standing test. *Kansas Bldg. Industry Workers Comp. Fund v. State*, 302 Kan. 656, 680, 359 P.3d 33 (2015). In that case, the court highlighted the difference between the Kansas and federal tests for standing:

> "[W]e have not explicitly abandoned our traditional state test in favor of the federal model. Moreover, as opposed to the United States Constitution, our State Constitution contains no case or controversy provision. The Kansas Constitution grants 'judicial power' exclusively to the courts. Kan. Const. art. 3, § 1. And Kansas courts have repeatedly recognized that 'judicial power' is the '"power to hear, consider and determine controversies between rival litigants."' Given the differences in the genesis of the two systems, we do not feel compelled to abandon our traditional two-part analysis as the definitive test for standing in our state courts. [Citations omitted.]" 302 Kan. at 679-80.

This two-part test thus becomes manifest. To show standing, a party "'must show a cognizable injury and establish a causal connection between the injury and the challenged

conduct.'" *State v. Stoll*, 312 Kan. 726, 734, 480 P.3d 158 (2021). A cognizable injury, or an injury in fact, occurs when the party personally suffers an actual or threatened injury as a result of the challenged conduct. *KNEA v. State*, 305 Kan. 739, 747, 387 P.3d 795 (2017); *Gannon v. State*, 298 Kan. 1107, 1123, 319 P.3d 1196 (2014). The parties must have "'adverse legal interests that are immediate, real, and amenable to conclusive relief.'" *Kansas Bldg. Industry Workers Comp. Fund*, 302 Kan. at 678.

All of this means that the appellants must show that they are injured and the injury stems from the statute they challenge to have standing. The appellants fear prosecution and state that the threat of a 17-month prison sentence and a fine of $100,000 has forced them to curtail their activities. To them, the threat of prosecution is real, based on their experiences of having people at prior voter registration events believe that they are election officials and not just volunteers seeking to promote democracy by assisting voters to register. There is the injury set out for all to see—these groups have curtailed their activities. Their free speech is now limited because of the threat of prosecution under this law. In my view, the injury and the cause of the injury are established.

But this two-part test is too simple for the majority. It tells us the question of standing "presents its own series of hurdles that must first be cleared before [the appellants'] burden to establish standing is satisfied." Slip op. at 11. The majority then goes on and creates an inexact evidentiary burden that must be met before the appellants can proceed. Our task is not to set up hurdles for the parties. The statement in Syllabus ¶ 2 is sufficient for me.

The district court, convinced that the appellants have misinterpreted the law, denied them any injunctive relief, and did not address the standing issue. The majority glibly criticizes the district court and holds that it took a misstep and "'put the merits cart before the standing horse.'" Slip op. at 10. I applaud the district court for having the

29

courage to address the merits of this controversy and not glibly rule that the appellants have no stake in this dispute. If there is a misstep here, it is by the majority.

We should address the important issue of whether this statute inhibits free speech and not avoid the question and leave it in doubt. The chilling effect on free speech by enacting legislation is just as harmful to free speech as a jail sentence for free speech. To prevent this chilling effect on protected free speech, pre-enforcement actions that test the constitutionality of statutes must be allowed—not avoided.

Without saying so, the majority appears to concede that these four groups' conduct falls within the ambit of the First Amendment to the United States Constitution. I will not hesitate to say so; the groups' activities involve the exercise of free speech. I would go further and say their conduct is under section 11 of the Kansas Constitution, since that is the question we should be addressing.

The majority holds that the activities of these four groups lack the "nefarious or deceptive qualities that K.S.A. 2021 Supp. 25-2438 is designed to combat." Slip op. at 15. That holding portrays what the majority believes the statute is meant to combat: intentional conduct that results in someone believing the groups are election officials, when they are not election officials. But there is more to the statute than that.

This holding reveals the error of the majority. K.S.A. 2021 Supp. 25-2438(a)(2) and (a)(3) of this law focus on appearances, not on the intentions of the person performing the acts. But appearances demand an observer. The majority says the appellants are looking at this law through the wrong lens. Not so. When dealing with appearances, the point of view is crucial. After all, subsection (a)(3) of the law makes it a felony to "engag[e] in conduct that would cause another person to believe a person engaging in such conduct is an election official." These appellants are facing prosecution and imprisonment. They are using the correct lens to look at this law.

30

The majority avoids the tough question of whether this statute violates the Kansas Constitution by ruling that the appellants lack standing. To do so, the majority interprets the questioned law to find that the appellants lack standing to question its interpretation because their activities are not prohibited by the statute. In other words, we will interpret the law so that we do not have to interpret the law. All of this is done with no evidence other than a few affidavits. That makes no sense to me.

The majority holds that "the appellants had to undertake their civic engagement activities knowing that they were reasonably certain to give the impression to event attendees, or '*would*,' *not* could, cause an event attendee to believe the appellants were election officials." Slip op. at 18. The majority concludes this could never happen.

Evidently, the majority does not believe the appellants' affidavits which assert that such impressions happen often. That is why they fear prosecution. I see nothing in this record that shows the appellants are lying about this.

The term "knowing" is the peg that the majority rests its cap on. A page or two after giving the statutory definition of "knowing" and then offering some dictionary definitions to the opinion that helps muddle the concept, the majority rejects the appellants' concerns. The appellants argue that when viewed properly, if someone in the audience thinks they are election officials, then they are subject to prosecution. In the words of the majority, "These interpretations are fundamentally flawed and run contrary to the plain language of the statute, which strictly prohibits *knowing conduct* on the part of the speaker, which results in the misrepresentation of their identity." Slip op. at 19.

A fair reading of these few affidavits reveals that the appellants know what they are doing at these meetings and they know that some people believe they are election officials. They fear prosecution under subsection (a)(2) of the statute that says, "gives the

31

appearance of being an election official" and subsection (a)(3) of the statute that says, "cause another person to believe a person engaging in such conduct is an election official." At this stage of this litigation, given the limited record we have, I cannot say the appellants' fears are irrational or subjective. I take them at their word. I see no flaw in their interpretation of this law.

In my view, under Kansas law, this question of standing is simple. Do the appellants have a cognizable injury? Must they first be arrested and prosecuted for violating this law before they can challenge the constitutionality of the statutes? The United States Supreme Court has counseled that in cases on constitutional rights, an actual arrest and charge is unnecessary.

"[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007). Instead, we have permitted pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent. We have held that a plaintiff satisfies the injury in fact requirement where he or she alleges "'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 134 S. Ct. 2334, 189 L. Ed. 2d 246 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298, 99 S. Ct. 2301, 60 L. Ed. 2d 895 [1979]).

I find this reasoning persuasive. We are dealing with a question of a violation of the right to freely speak as found in section 11 of the Kansas Constitution Bill of Rights. The appellants intend to continue with their voter registration activities. The appellants need not expose themselves to actual arrest or prosecution to challenge a criminal statute that deters the exercise of their constitutional rights of free speech. We should not hold

that the rules on standing to sue force the appellants to choose between refraining from core political speech or engaging in that speech and risking criminal prosecution.

What the majority fails to appreciate is that free speech can be limited by the passage of this law. The threat of prosecution can force someone to refrain from free speech—no case needs to be filed against them for their speech to be stifled. That is what has happened here. These four groups have curtailed their activities because of the threat of prosecution. I cannot agree that their fears are irrational based on this tiny record that we have. Perhaps there could be no successful prosecutions here, but if the activities have been curtailed anyway, there is no need to prosecute. The goal of curtailing free speech has been accomplished without filing a case.

I must comment on the dueling prosecutors' comments raised by the parties. I am not convinced that we should be concerned about them. This is a facial challenge to this statute. It either passes constitutional muster or it does not when it comes to free speech.

A prosecutor's decision not to prosecute does not render a statute constitutional and enforceable.

And I am not convinced that the Attorney General's argument that he does not intend to prosecute the appellants means that they lack standing. After all, he speaks only for himself and not all of the prosecutors in Kansas. Additionally, he cannot bind all future attorneys general by his expressions of self-restraint in this litigation.

The Kansas Supreme Court has not adopted the Tenth Circuit's view that plaintiffs lack standing to sue where there is an explicit declaration by the prosecutor that the plaintiffs would not be prosecuted. In *Bronson v. Swensen*, 500 F.3d 1099, 1109 (10th Cir. 2007), the court ruled that there was no standing where plaintiffs were never charged or directly threatened with prosecution under the state polygamy statute, the plaintiffs

admitted the law was not being enforced, and the attorney general's policy was to not focus law enforcement efforts on consensual polygamous relationships involving adults.

When the Douglas County District Attorney's press release contended that this law should not be followed, the Attorney General responded with a press release saying, in effect, that all election laws should be prosecuted. This sequence lends weight to the appellants' fears of prosecution. Timing of events often tells more than the event itself. But I realize that no evidence has been offered in this lawsuit but a few affidavits.

I am concerned with a facial challenge to a statute that is said to be overbroad and vague. It allegedly restricts the free speech guaranteed by the Kansas Constitution. The expression of one prosecutor does nothing to eliminate the possible vagueness or breadth of this law.

Two Kansas cases offer us guidance on the question of overbreadth. In a case construing the licensing ordinance of Wichita governing after-hours establishments, a panel of our court ruled:

> "To have standing to challenge a law as being so overbroad as to infringe upon rights protected by the First Amendment to the United States Constitution, a party need not establish that he or she was personally injured by the disputed law because the mere existence of the disputed law may cause persons not before the court to refrain from conduct protected by the First Amendment. To establish that this law is unconstitutionally overbroad contrary to the First Amendment, a party must prove (1) that the protected activity is a significant part of the law's target and (2) that there exists no satisfactory method of severing the law's constitutional from its unconstitutional applications. If a party argues that the law prohibits protected First Amendment conduct, not merely protected First Amendment speech, that party must further prove that the law's overbreadth is not only real, but substantial, in relation to the law's plainly legitimate sweep." *City of Wichita v. Trotter*, 60 Kan. App. 2d 339, Syl. ¶ 6, 494 P.3d 178 (2021), *rev. granted* 315 Kan. ___ (February 25, 2022).

34

The same reasoning should be applied here in dealing with the Kansas Constitution's guarantee of free speech. The existence of this law may cause other persons not before this court to refrain from exercising their free speech rights.

And then, in a case involving a prosecution for human trafficking and promoting prostitution, the Kansas Supreme Court held:

> "Generally, if there is no constitutional defect in the application of the statute to a litigant, the litigant does not have standing to argue that the statute would be unconstitutional if applied to third parties in hypothetical situations. This general rule does not apply, however, when a litigant brings an overbreadth challenge that seeks to protect First Amendment rights, even those of third parties. Instead, an exception has been recognized because the mere existence of the statute could cause a person not before the court to refrain from engaging in constitutionally protected speech or expression." *State v. Williams*, 299 Kan. 911, Syl. ¶ 1, 329 P.3d 400 (2014).

I view this to be binding authority. Therefore, the majority should recognize that this exception applies here. This case involves a claim that the statute is overbroad and the majority should recognize the "injury" component of the standing rules to accommodate the resolution of the overbreadth claims.

To sum up, this is a facial challenge to a statute that was recently enacted. The claims center on overbreadth and vagueness. We have no history of prosecution or restraint from prosecution. The defendants have disavowed prosecution as a position taken here but they speak only for themselves and not all of the officials who prosecute crimes in Kansas. The appellants have curtailed their activities because of this law. It is unreasonable to conclude that the appellants lack standing.

We must follow the directions given by the Kansas Supreme Court and use a two-part standing test to decide this issue. Is there a cognizable injury here? The answer is yes. The appellants have curtailed their voter registration activities because of their fear of prosecution. Is there a causal connection between the injury and the law they seek to have declared unconstitutional? Yes. That law is why they would be prosecuted. Having satisfied both parts of the test, we should hold that these four groups have standing to sue and get to work on interpreting this statute to see if it passes constitutional standards.